tain district to act as magistrates, and that, if they do so act, peace officers shall not be compelled to serve their warrants or enforce their commitments? Without directly taking away the power, can the duty be withdrawn and the power so undermined as to make it practically useless, and the office still be left intact?

The object of a written constitution is to regulate, define, and limit the powers of government by assigning to the executive, legislative, and judicial branches distinct and independent powers. The safety of free government rests upon the independence of each branch, and the even balance of power between the three. Unite any two of them, and they will absorb the third, with absolute power as a result. Weaken any one of them, by making it unduly dependent upon another, and a tendency towards the same evil follows. It is not merely for convenience in the transaction of business that they are kept separate by the constitution, but for the preservation of liberty itself, which is ended by the union of the three functions in one man, or in one body of men. It is a fundamental principle of the organic law that each department should be free from interference, in the discharge of its peculiar duties, by either of the others. Nothing is more essential to free government than the independence of its judges, for the property and the life of every citizen may become subject to their control, and may need the protection of their power. Not a contract is made except in reliance upon their ability to afford redress if it is violated. Men part with property upon the promise of their fellows, walk the streets by day, and sleep in peace at night, in the confidence that the silent and unseen power of the judiciary is always ready to protect their rights. Any legislation that hampers judicial action, or interferes with the discharge of judicial functions, is in conflict with the principles of the constitution. Whenever a judge, however humble, is authorized by law to hold a criminal court, established by the constitution, and to require executive officers to serve his warrants and enforce his judgments, the legislature cannot leave him the power to act, and withdraw from him the power of compelling obedience to his lawful mandates, without affecting his independence and depriving him of the essential powers of a judge.

On the 26th of June, 1896, the relator, upon complaint being made before him, issued a warrant, and the offender was arrested, tried, and sentenced to imprisonment. Thereupon the justice issued the usual commitment to a peace officer to take the person convicted to the county jail. But, according to section 19 of the act under consideration, he could not require that officer to obey the order, and the command of a judge to enforce a valid judgment became no more than a mere request to do so. He was thus obliged to coax those whom, if he was still a judge, he had the right to command, and the enforcement of a lawful judgment depended upon the good will of a constable. In other words, a judge, acting according to law in every respect, was by this legislation made dependent upon the favor of an executive officer in order to have his lawful commands obeyed. Is any argument necessary, under these circumstances, to show that the independence of the judge was destroyed? The lawful command of a judge is the command of the people of the state of New York, in their organized capacity under the constitution, and the legislature has no power to say, directly or indirectly, that such a command shall not be obeyed. While, in many cases, it can take away the jurisdiction of the judge altogether, it cannot leave him clothed with full power to render judgment, and then prevent him from causing that judgment to be enforced, by saying to peace officers that they need not obey his lawful commands unless they choose to do so. If such legislation is sustained, the independence of the judiciary and the freedom of the law will depend upon the generosity of the legislature.

While we hesitate, as every court should, to set aside a solemn act of legislation, yet it is our high prerogative to defend the constitution, and to protect the humblest judge from interference with his judicial functions in violation of its command. That duty we now discharge by adjudging that sections 19 and 20 of chapter 22 of the Laws of 1896 are unconstitutional and void. The order appealed from should be affirmed, with costs. All concur, except O'BRIEN, J., who reads for reversal (see 49 N. E. 780), and PARKER, C. J., and HAIGHT, J., who concur with O'BRIEN, J. Order affirmed.

---

PEOPLE ex rel. RYAN et al. v. BOARD OF SUP'RS OF WASHINGTON COUNTY.

(Court of Appeals of New York. March 8, 1898.)

Appeal from supreme court, appellate division, Third department.

Application by the people, on the relation of Thomas Ryan and others, against the board of supervisors of Washington county, for a writ of mandamus to compel defendants to audit relator's claim for fees. From an order of the appellate division (45 N. Y. Supp. 347) affirming an order directing the issue of a peremptory writ, defendants appeal. Affirmed.

R. O. Bascom, for appellants. Edgar Hull and Lewis E. Carr, for respondent.

VANN, J. This case is a companion to one argued with it, involving the same principle and already decided. People v. How-

land, 155 N. Y. 270, 49 N. E. 775. The relator in that case was a justice of the peace of the town of Ft. Edward, in Washington county, while the relator in this is a deputy of the sheriff of that county. Each claimed compensation for services rendered in criminal proceedings in said town, by the one as justice of the peace and by the other as deputy sheriff. Both claims were rejected when presented to the proper authorities, not upon the merits, but upon the ground that there was no power to audit or allow the same by reason of sections 19 and 20 of chapter 22 of the Laws of 1896. In deciding the case where a justice of the peace was relator, we held that those sections were void, because they attacked and partially destroyed an office protected by the constitution. It is claimed in this case that, as a deputy sheriff is not a constitutional officer, the act is valid and binding as to him. Without discussing the question whether a deputy sheriff has any existence apart from the constitutional officer who appoints him, we recognize no distinction in principle between the case already decided and that now under consideration, because we regard each of said sections as a part of a plan to undermine the office of justice of the peace in the town of Ft. Edward. We held in the other case, and we repeat the holding in this, that those sections are unconstitutional and void, because they violate the spirit of the organic law of the state. The order should be affirmed, with costs. All concur, except O'BRIEN, J., who reads for reversal (see infra), and PARKER, C. J., and HAIGHT, J., who concur with O'BRIEN, J. Order affirmed.

O'BRIEN, J. (dissenting in both cases). The courts below have held that sections 19 and 20 of chapter 22 of the Laws of 1896 are in conflict with the constitution, and therefore null and void. That is the only question presented by the appeal. The act is entitled "An act to provide for the better administration of justice in the town of Fort Edward in the county of Washington." There are two records and two appeals, involving the same question. They were heard and decided below as one case, and may now be discussed and reviewed in the same way. The relator Ryan is a constable of the town of Ft. Edward, and also a deputy sheriff. In December, 1896, he presented to the board of supervisors of Washington county a bill of $12.90 for fees charged by him in the arrest and detention of two parties charged with crime in the town of Ft. Edward. The board rejected the claim, and refused to allow the same, on the ground that, by the terms of the two sections of the act above mentioned, it was not a legal charge against the county or the town. The relator Burby is one of the justices of the peace of the town of Ft. Edward, elected in March, 1894, to fill a vacancy in an unexpired term ending the last of December, 1896. He presented to the town board, in the month of November, 1896, a bill of $24.75 for fees in proceedings before him as justice in certain criminal cases, which the board refused to allow, on the ground that, by the terms of the two sections above referred to, the claim was not a legal charge against the town. On looking into the bill it will be seen that a large part of it consists of items for fees and services in the arrest and examination of persons charged with being what are there styled "state tramps." The courts below have held that both the justice and the constable were entitled to peremptory writs of mandamus requiring the boards to audit and allow the bills, although the sections of the statute above referred to declare that they are not legal charges against the town or the county. The nineteenth section enacts that no constable or deputy sheriff shall be required to serve any criminal process in the town, and that neither the town nor the county should be in any way chargeable for such services, or bound to pay the same. The twentieth section provides that no justice of the peace should be required to issue any criminal process in cases within the town, and that neither the town nor county should be chargeable with any fees or services rendered by a justice of the peace in criminal cases. All that the legislation in question did was to relieve the justice and the constable from all obligation to perform any duties in criminal cases arising in the town, and, having relieved them from the duties, deprived them of the right to charge the town or the county with fees for services which it was not their duty to perform.

The courts below have held that the legislature has no power to do this, since the constitution stands in the way. On looking into the opinion of the learned judge at special term, and then into that of the learned judge who spoke for the appellate division, it is quite difficult to identify the particular constitutional provision which they supposed had been violated by the legislature in this case. The learned judge at special term was apparently of the opinion that the two sections violated that provision which forbids the legislature from passing any private or local bill decreasing the fees or allowances of public officers, while the learned judge at the appellate division virtually held that the sections were void because they practically abolished the ancient and constitutional office of justice of the peace in the particular town in question. The act in question contains 23 sections, and, in order to properly consider the questions presented by this appeal, the general scope and purpose of the act, as a whole, must be kept in view. It provides for the election of a police justice in the town, to be paid a salary of $300 per year, and confers upon him the same jurisdiction in criminal

cases as the justices of the peace of the town. It provides that the fees charged and received by him in criminal cases shall be paid over to the supervisor, and not applied to his own use. It then provides for the annual election of a police officer at a fixed compensation, with power to serve all criminal process, and requires him to serve all process issued by the police justice in criminal cases, and that the costs and fees therefor chargeable by law shall not be retained for his own use, but must be paid over to the supervisor. It appears, therefore, that this rural town, with a population of 6,000 people all told, and a territory 10 miles in length and 3 or 4 miles wide, was provided with adequate machinery for administering the criminal law and preserving the public peace. The legislature decided that both economy and efficiency would be promoted by concentrating the duties of examining magistrate and conservators of the peace in this town in two persons, and relieving the justices of the peace and constables from all duties in that regard.

That it was not a wanton or arbitrary interference with the local affairs of the town appears from a very significant affidavit by the supervisor of the town and chairman of the board of supervisors of the county, which appears in the record and is not denied or questioned. The origin and purpose of this legislation is there clearly stated. It is shown that the statute was passed at the request and solicitation of a large majority of the people of the town, not only for the purpose of better conserving the cause of law and order, but of reducing the burden of taxation, by putting an end to the ill-considered and ill-advised action of justices of the peace and constables in soliciting and procuring tramps and vagrants to be arrested and committed for maintenance to the county jail for the sole purpose of enabling the justices and constables to present bills for services against the town or county, and that this practice had become such a grievous abuse that upon more than one occasion the supreme court had instructed the grand juries to inquire into the same. Moreover, he states that, after the act became a law, and at a public meeting of the voters of the town, a resolution was unanimously passed thanking the senator and assemblyman representing the town in the legislature for their aid in procuring the enactment of the law. All this however, counts for nothing, unless the legislature had power to pass the bill and to enact the sections in question. It only shows that the will of the people, however flagrant may be the abuse which they attack, or however laudable the reform which they advocate, must be subordinated to the restraints of the fundamental law. It appears that the justices of the peace and the constables, like the silversmiths of Ephesus, were not satisfied with the new law. It damaged their business, and reduced the opportunities for making money, and they appealed to the courts for protection, and thus far they have had it, since it has virtually been held that, after a justice of the peace or a constable has been once installed in office, the law-making power of the state is powerless to deprive them of the opportunity of earning fees from the town or county in looking after tramps and vagrants, and acting occasionally in the early stages of other cases of a criminal character. In this case the justice and constable volunteered to perform services which it was not their duty to perform, and yet, in defiance of the express mandate of the legislature, and of the will of the town and county, they have been awarded compensation to the same extent and in the same way as if the legisature had never passed the act in question. The claims of these two parties, when united, were less than $38, though the costs awarded upon the application for the mandamus were $50; and it must be quite clear that the only importance that the case could ever assume is due to the fact that the parties and the courts below regarded it as involving an important question of constitutional law. This brings us to the inquiry as to what provision of the constitution has been violated by the legislature in the passage of this act.

1. It does not increase or decrease the fees or allowances of any public officer. The fees of a justice of the peace or a constable are just the same now in the town of Ft. Edward as they were before the passage of the act. They have not been increased or diminished. The only change made is with respect to the persons entitled to receive them, and the uses to which such fees may be applied. The relators are affected by the act only in one respect, and that is that they cannot charge fees to the town or county when they volunteer to perform services in criminal cases, but the fees are still the same. The volume of the relators' business may have been diminished by this legislation, but the fees of justices of the peace and constables have not. If we inquire with respect to the amounts which a justice of the peace or constable may charge for any given service in the town of Ft. Edward in criminal cases now, and find that they are the same as before the passage of the act, it must follow that the bill did not increase or decrease fees. The police justice and police officer created by the act are entitled to charge the same fees allowed before, and no more, but they must be paid to the supervisor, for the benefit of the town, since these two officers are compensated by fixed salaries.

2. There is nothing in the body of the act not germane to the title. The two sections in question simply provide that justices or constables are relieved from all duties, and therefore may not charge fees, to the town or county in criminal cases. That such provisions may properly be inserted in a private

or local bill, with such a title as that now before us, is too plain for argument.

3. The legislature had power to create the police court in the town under that provision of the constitution which authorizes the creation of inferior local courts of civil and criminal jurisdiction. Const. art. 6, § 18.

4. The act does not in any sense or in any degree abolish the office of justice of the peace. The act does not touch the power, jurisdiction, or authority of the justice in the slightest particular. He may now do everything that he could have done before the act was passed. He can exercise every power now that he could then. In ancient times the office was an honorary one purely. There were no fees attached to it, and no civil jurisdiction. All that is found in statutes, and I suppose no one will deny that the legislature may repeal or modify the statutes. The constitution, while recognizing the office of justice of the peace, does not deal at all with either the jurisdiction or the fees. All that is left to the legislature, and it may increase or diminish either the one or the other, or both, at pleasure. This statute, therefore, does not in the slightest degree abolish, or attempt or even tend to abolish, the office of justice of the peace, unless, indeed, we hold that the office consists of what may be made out of it under the most favorable circumstances. The business of hunting down tramps and vagrants in the rural districts, in what are called "hard times," is capable of being developed into a very high state of perfection, and if the justice and constable have a sort of vested right in what can be earned in that way, in the nature of property, beyond the power of the legislature, there must be certain guaranties in the constitution that have never been discovered before.

When we consider the origin and history of the ancient and honorable office of justice of the peace, it occurs to me that it is now very much belittled, if not disgraced, by the contention that it is destroyed whenever the legislature attempts to interfere with the opportunities of the person who happens to hold it for the time being of making money out of it. When this case is stripped of all irrelevant argument and illustration, the only objection that can be urged against the statute in question is that, and nothing more. The legislature has relieved the justice of a very small part of his duties, and has enacted that, if he still insisted on performing them, it should be without fees against the town or county, as his predecessors in England did centuries ago. That this was not only a constitutional, but, under the circumstances, a just and reasonable, exercise of power, I cannot doubt. It is a mistake to suppose that the legislature is prohibited from abolishing the office of justice of the peace. In point of fact, numerous statutes have been passed abolishing the office, and they have been held to be constitutional. Curtin v. Barton, 139 N. Y. 513, 34 N. E. 1093. There is scarcely a city in the state where the office of justice of the peace did not once exist, but has been abolished by some form of legislation. The only provision of the constitution upon the subject is to be found in article 6, § 17, which simply provides that the electors of the several towns shall, at their annual town meetings, or at such other time and in such manner as the legislature may direct, elect justices of the peace, whose term of office shall be four years. There is nothing whatever in the statute in question which in the slightest degree interferes with the right of the electors of the town to elect justices of the peace at town meetings, or that changes the tenure of the office. The electors must still elect justices of the peace in the same way and for the same term. They may not have quite so much criminal business to do hereafter as they have had heretofore, but surely that is no reason for pronouncing a solemn act of the legislature void. Indeed, when all the reasons for holding the statute invalid are fully weighed and measured, it is quite difficult to treat or consider them all seriously. It is claimed that this legislation was enacted for the purpose of insidiously undermining the office of justice of the peace in this particular town. There is nothing on the face of the bill that gives the slightest color to this assertion, and surely we ought not to attribute to the legislators a purpose or motive in the enactment of a law that is not disclosed by the statute itself. Manufacturing Co. v. Shanahan, 128 N. Y. 345, 28 N. E. 358. The only purpose that the legislature had in the enactment of the statute was to relieve the taxpayers from claims upon the treasury of the town or county for services in colorable proceedings against tramps, vagrants, and petty criminals,—a business which, it seems, had been developed and enlarged to such an extent as to become an abuse and a scandal. This was the moving cause of the legislation, according to the uncontradicted affidavit of the town authorities themselves, and they add that the statute, in its actual operation, has accomplished the purpose by correcting the abuses. The motive and purpose of the enactment was, therefore, not only legal, but laudable.

But this court has nothing to do with the motives of the legislature. It is not for the courts to attribute improper motives to the legislature, any more than it is for the legislature to attribute improper motives to the courts for their judicial action. The question is one of power and nothing else. When that simple inquiry is devested of all sentimental considerations, and the question divorced from the vigorous rhetoric and specious argument in which it is beclouded, the proper solution depends upon the correctness of a few propositions that seem to me so plain that every professional mind must accept them: (1) The legislature had the power to provide for the election of a police jus-

tice and a police officer in a town containing a considerable village, to fix their salaries, and confer upon them the powers of a justice of the peace and constable in criminal cases. That was the main purpose of the bill, and no one seriously questions the validity of the law in that respect. (2) Having gone so far, did the legislature have the power to relieve the people of the town from all legal obligation to pay fees for services in criminal cases, or compensation to local officers, other than the sum fixed and designated as salaries? That is the power which it has exercised in the two sections of this statute which it is claimed are invalid, and I am not aware of any suggestion at the argument, or in the printed brief, that casts the slightest doubt upon the existence of this power in a lawmaking body which is supreme, except so far as restrained by the constitution. (3) May the legislature, when providing for the administration of criminal justice in a town by a police justice and police constable, devest or relieve justices of the peace from all legal obligation or duty to entertain complaints or issue process in criminal cases? Inasmuch as every duty that can be performed by a justice of the peace in criminal cases is imposed by some statute or law enacted by the legislature, the conclusion would seem to be irresistible that the power which enacted the law may repeal it or modify it, and the same power that imposed the duty can withdraw it. If the legislature may lawfully exercise the powers specified in these three propositions, then there can be no fair question with respect to the validity of the statute. That it does possess such power cannot, I think, be doubted; and to hold that the legislation in question abolishes the office of justice of peace is little less than asserting that an office is abolished whenever its pecuniary attractions are diminished by law. The particular justice who instituted this proceeding possessed, after the passage of this statute, every right and power as an officer that he possessed before, except the right to charge fees to the town or county in criminal cases; and to say that a statute which affects him to that extent only is void seems to me to be a proposition that cannot be seriously discussed, and I have discussed it only because able and eminent counsel who has presented the other view of the case has evidently the utmost confidence in the correctness of his position, and, moreover, has impressed the court with the same view.

Suppose we hold this law to be constitutional and valid; will the office of justice of the peace in the town of Ft. Edward be then abolished? Of course, if the office of the relator in this case will be abolished, so will that of all the other justices in the town in like manner, and the result must be, if the relator's contention is correct, that hereafter there can be no justices of the peace, in the constitutional sense, in the town. If that be so, it must follow that the right to charge fees to the town and county in criminal cases is an essential part of the office itself, annexed to it by the constitution in perpetuity, and beyond the power of the legislature to change. I doubt if any one would seriously urge such a proposition, and yet it is what the relator's contention must really mean when analyzed. That office is abolished, or it is not abolished, by this legislation, since it is impossible to conceive of any middle state between regular official existence and that statutory death which it is claimed that the legislature has inflicted upon these town officers in violation of the constitution. But the truth is, as every one must know, that no law providing for the election of justices of the peace has been interfered with in the slightest degree. They will still continue to be elected just the same as if the act had never been passed, and they will still possess the same powers, and be authorized to do precisely the same things, that they always did, except to draw fees from the town or county for services that they are not required to perform. The town has elected another officer, at a fixed salary, to do the things that the relator has volunteered to do; so that, from whatever point we start, we come back again to the inquiry whether the legislature has power to reduce the business of a justice of the peace by relieving him from all duties in criminal matters, and the town or county from all obligation to pay him, should he elect to do the things which he is no longer required to do. When powers or duties are created solely by statute, it would seem to be a plain and reasonable proposition that the same authority that originally granted the power or imposed the duty may recall it, and relieve the officer from all obligation with respect to the duty thus imposed. The officer certainly can have no vested right in the exercise of a statutory power or the performance of a statutory duty.

It requires no argument to show that the people of a town, through an act of the legislature, may reduce the expenses of local government, and lighten the burden of local taxation; but, in order to do that, they must necessarily reduce the business or fees of the officers to whom the taxes are paid. The act in question does that, and nothing more; and, if the legislature has offended the constitution, that is the head and front of the offending. I cannot bring myself to believe that this court is warranted in declaring such a statute, or any part of it, void. So much legislation of this character has been enacted that I fear such a decision would form a precedent that might be very troublesome hereafter. There is scarcely a volume of the Session Laws in which legislation of this character may not be found. The sheriffs and county clerks are certainly constitutional officers, in at least the same sense as a justice of the peace is. They were all

formerly, and most of them still are, compensated by fees; but no one can doubt that this whole subject is within the scope of legislative power. The fees may be abolished, and a salary, great or small, substituted in their place; and no one would claim that the office was abolished because its money value had been diminished. Can there be any doubt as to the power of the legislature to provide that fees in criminal cases shall be paid over to the town by the justice of the peace for the benefit of the poor, and a nominal salary substituted in their place? This would reduce his income in the same sense that the act in question does, but, unless the justice had a vested right to all fees prescribed when he went into office, the legislation would be valid.

But, whatever may be said about the justice, clearly the constable was not a constitutional officer, and he cannot complain, even if his office was abolished, though it certainly was not. The legislature could certainly dispense with his services as a peace officer if it thought proper, and provide that, in case he elected voluntarily to perform services that he was not bound to perform, then no fees should be chargeable for such services to the town or county. It has so declared in a separate and distinct section of the act, and how any provision of the constitution was violated by such a law it is certainly very difficult to see. The power and duty of the judiciary, when called upon to deal with the question of the validity of a statute, was well expressed by Judge Andrews in this court in these weighty words: "Only when required by the most cogent reasons, nor, indeed, unless compelled by unanswerable grounds, will a court declare a statute to be unconstitutional." People v. Budd, 117 N. Y. 13, 22 N. E. 670, 682. There has been, I think, a wide departure from this rule in dealing with the statute in question. The services of both the justice and constable having been performed long after the act in question took effect, their claims were not valid charges against the town or county, and the respective boards to which they were presented for audit and allowance properly rejected them. The order of the appellate division and that of the special term, awarding the mandamus to the relators, should be reversed.

---

GEORGE W. McALPIN CO. v. FINSTERWALD et al.

(Supreme Court of Ohio. Feb. 1, 1898.)

PARTNERSHIP — JUDGMENT BY CONFESSION — COLLATERAL ATTACK — APPEAL — DECISIONS REVIEWABLE — RECOVERY OF MONEY.

1. Where, in good faith and for a firm debt, a judgment has been rendered against the firm, by confession, on a warrant of attorney executed in its name and on its behalf by one partner only, without the assent of his co-partner, such judgment cannot be impeached or set aside by a creditor of the firm.

2. Where a number of judgments had been recovered against a mercantile partnership by its creditors, executions issued on them, by virtue of which all the partnership property had been seized and sold, and the proceeds are in the hands of a sheriff for distribution, one of the execution creditors made a demand on the sheriff for the share of the fund which it claimed, and, on payment being refused by such sheriff, brought an action against him, not as sheriff, but as an individual, to recover the sum thus demanded. The sheriff made no defense, but procured an order of court substituting for him certain other execution creditors of the firm. Thereupon the latter filed cross petitions in the action, setting forth their respective claims to the fund, and also setting forth facts designed and tending to impeach the validity of the plaintiffs' judgment, and to procure a decree canceling and setting aside that judgment, together with the execution thereon, and thereby exclude the plaintiff from participating in the distribution of the fund, but asking no relief against the sheriff. *Held*, that the cause of action set forth in such cross petitions is not for the recovery of money only, and that, as the trial in the court of common pleas was conducted exclusively on the issues joined between the plaintiff and the substituted defendants, on the cross petitions, neither party was of right entitled to a trial by jury, and the action was therefore appealable under the provisions of section 5226, Rev. St.

(Syllabus by the Court.)

Error to circuit court, Athens county.

Action by the George W. McAlpin Company against John Finsterwald and others. Defendants James D. Brown and the First National Bank had judgment. Plaintiff's appeal to the circuit court was dismissed, and the judgment was afterwards affirmed by that court on error. To reverse these judgments he now brings two proceedings in error. Reversed.

The plaintiff in error brought an action in the court of common pleas of Athens county against John Finsterwald to recover of him a proportion claimed by it of $6,000 that had come into his custody as sheriff of said county of Athens, and was the proceeds of a stock of merchandise owned by Palmer & McGrath, a partnership, and which had been sold by said sheriff under two writs of execution issued to him,—one, on a judgment against said firm recovered by the First National Bank of Athens; the other, on a judgment against the firm in favor of James D. Brown. Such proceedings were had in the action that said bank and said Brown were each made parties thereto, and each answered, setting forth a claim to priority over the plaintiff to the fund in controversy. The cause was tried in the court of common pleas to the court, and judgment given in favor of Brown and the bank. The plaintiff gave notice of its intention to appeal the cause to the circuit court, and afterwards did so. This appeal was upon motion by the defendants dismissed, on the ground that the action was not appealable. Upon this dismissal of the appeal, the time within which to begin proceedings in error not having then expired, the plaintiff instituted pro-